

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00172-CR

_____

BARBARA HOLZ, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court
Marion County, Texas
Trial Court No. 12,944

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

There is no question that the dog named Misty, also identified as "Lone Star 42," was a pitiful sight when the Rescue and Investigations Division of the Society for the Prevention of Cruelty to Animals (SPCA) of Texas removed her from Barbara Holz's Marion County property. Beyond that indisputable fact, however, the SPCA's view differed from Holz's perspective.

Holz claimed that Misty was about fifteen years old at the time; the SPCA estimated her age at around eight years. Holz claimed that she had been nursing Misty toward health, with some success, and that Misty was properly and carefully provided food and water. The contrary view was that Misty was not provided adequate food and water. Misty was one of the more extreme examples among a large number of dogs taken from Holz's property at the same time, in varying degrees of distress and poor condition.

Holz was convicted of the misdemeanor offense of cruelty to animals.[1] After reviewing the briefs before us, the record of the trial below, and the applicable law, we affirm the judgment of the trial court because (1) veterinary reports admitted into evidence at trial were not testimonial, (2) Holz did not preserve her complaint regarding admission of testimony about dead dogs found nearby, and (3) the evidence was legally and factually sufficient.

---

[1] We have been presented with a record for only the case in which Holz was convicted. Holz asserts she was tried for two charges of misdemeanor cruelty to animals, where each case alleged an offense against a specific animal. Holz says she was acquitted on one charge and convicted of the other. The State does not dispute this representation of the proceedings, and the statements at opening and closing arguments, as well as testimony throughout the trial, support this reading of the procedural history. The parties also seem to agree that the one charge for which Holz was convicted involved an allegation of failing to provide food, water, or shelter to an animal referred to in the SPCA investigation and then at trial as "Lone Star 42," a dog Holz called "Misty."

*(1)     Veterinary Reports Admitted into Evidence at Trial Were Not Testimonial*

Holz's first two points of error claim violations of her Sixth Amendment right to confront witnesses against her.   Holz claims confrontation violations in evidence of two forms generated by the SPCA, one by its veterinary technician (State's Exhibit 4, the subject of Holz's first point of error), and another by its chief veterinarian (State's Exhibit 5, addressed in point of error 2).   *See Crawford v. Washington*, 541 U.S. 36, 68 (2004).   In *Crawford*, the United States Supreme Court held that out-of-court testimonial evidence violates the Confrontation Clause unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine him or her. *Id*.

The State argues, as it did at trial, that the documents were admissible as business records. *See* TEX. R. EVID. 803(6).   That the reports are business records is not contested.

Even if a statement is allowed by a rule of evidence, it may still be testimonial and implicate the Confrontation Clause.   Last year, the United States Supreme Court discussed, in this context, hearsay exceptions such as that for business records, noting, "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because–having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial–they are not testimonial."[2]

---

[2]Melendez-Diaz was tried for distributing and trafficking in cocaine.  *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 2530 (2009).   To prove the substance at issue was cocaine, the State presented certificates of analysis, which were affidavits from analysts at the state laboratory stating, "The substance was found to contain:   Cocaine."   *Id.* at

3

*Melendez-Diaz*, 129 S.Ct. at 2539–40. For the *Melendez-Diaz* Court, the question of the document qualifying as a business record was less important than the fact that it was "prepared specifically for use at . . . trial." *Id.* at 2540. Evidence can qualify as a business record exception to the hearsay rule and still be testimonial in nature.

We must determine whether the challenged exhibits are testimonial, and we do that as a question of law. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

Although the United States Supreme Court has not set out a detailed definition of what constitutes "testimonial" statements, it has described such statements as those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51–52. In a test that can be confidently applied in this case, statements are testimonial only when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822; *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). If that purpose is medical treatment, for example, the statement would not be testimonial. *Melendez-Diaz*, 129 S.Ct. at 2533 n.2 ("medical reports created for treatment purposes . . . would not be testimonial").

---

2531. The defendant objected, asserting that the Confrontation Clause required the analysts to testify in person. *Id.* The Court held that "the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment" and that the defendant had a right to confront the analysts at trial. *Id.* at 2532. The United States Supreme Court looked to the substance of the certificates to determine if they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" and to the use of the affidavits to determine if they were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" *Id.* (quoting *Davis v. Washington*, 547 U.S. 813, 830 (2006); *Crawford*, 541 U.S. at 52).

The SPCA came to Holz's house, corralled, cataloged, and seized the animals; and it was employees of the SPCA, the veterinary technician and the SPCA's chief veterinarian who authored the reports which form the basis of Holz's *Crawford* complaints.[3] While it is possible that the authors of those reports could have reasonably believed that these reports would be available at a later trial, such a conclusion is not clear, and there is no evidence the documents at issue in Holz's trial were prepared specifically for use at her trial. *Cf. Melendez-Diaz*, 129 S.Ct. at 2540 (statements at issue "prepared specifically for use at petitioner's trial"). There is nothing in the record to suggest the documents were prepared in anticipation of or preparation for trial.

Here, SPCA investigator Chris West testified that the Rescue Evaluation Form—State's Exhibit 4, compiled by a veterinary technician—was a form that was "done on any animal with the exception of equine and cattle." State's Exhibit 5, filled out by the SPCA chief veterinarian, was described as "a veterinarian request that the investigators and evaluators would fill out while they are evaluating animals if we feel that they need to be seen by a vet within the first 24-hours of our care." West went on to describe the conditions in which the animals lived outside the home, and he concluded the animals needed to be removed from the property. From the context of West's testimony and pictures in the record, it appears similar "Rescue Evaluation Forms" were completed on all dogs at the scene. Exhibit 5, completed and signed by a veterinarian, has two distinct sets of handwriting; one set says, "Rescue–Please check body condition, hair loss, eye

---

[3]The only law enforcement agent to testify at trial was a Marion County sheriff's office investigator who testified that (1) he was present when the warrant to seize the dogs was executed and, (2) he arrested Holz.

discharge   *Dog was extremely hungry*." The second style of handwriting, presumably by the veterinarian, says, "THIN & EMACIATED [;] NO [SYMBOL UNCLEAR] OR DIARRHEA NOTED [;] EATING VORACIOUSLY [;] DIFFUSE ALOPECIA."   Based on the context of the testimony from West and the exhibits, we conclude these documents were compiled for diagnostic or medical treatment purposes, and therefore are not testimonial.   *See Melendez-Diaz*, 129 S.Ct. at 2533 n.2; *Berkley v. State*, 298 S.W.3d 712, 715 (Tex. App.—San Antonio 2009, pet. ref'd) (where there was unchallenged evidence sexual assault nursing examination report was completed for purpose of rendering medical treatment, report not testimonial; citing *Crawford* and *Melendez-Diaz*).[4]   As State's Exhibits 4 and 5 were not testimonial, the trial court did not err in admitting them to evidence.   Holz's first two points of error are overruled.

*(2)     Holz Did Not Preserve Her Complaint Regarding Admission of Testimony About Dead Dogs Found Nearby*

Holz also claims error in the trial court's admission of testimony that Don Adams, Holz's neighbor, found dog carcasses on his property and that drag marks led from the container in which the animals were found to Holz's property.   Adams also testified that he found dead dogs on "the Corp" property, which apparently was United States Corp of Engineers property adjacent to

---

[4]*Cf. Long v. State*, No. 11-07-00319-CR, 2009 Tex. App. LEXIS 6577 (Tex. App.—Eastland Aug. 20, 2009, pet. dism'd) (mem. op., not designated for publication) (Trial court admitted, under hearsay exception for statements for purposes of medical diagnosis, toxicology report completed during autopsy of murder victim.   Toxicology report was negative for use of alcohol or drugs.   Court found toxicology report testimonial, and therefore trial court erred in allowing its admission; error was found harmless beyond reasonable doubt.).

Adams', and possibly to Holz's as well.    The inference to be drawn by the jury seems to have been

that Holz took the bodies of dead dogs to these properties.

Adams' testimony and Holz's objection occurred as follows:

Q.      [By the State]  Did you find dead dogs on your property?

A.      [By Adams]            I did.

Q.       And did you see dead dogs on the Corp property, by the way?

[Defense counsel]:    This testimony, Your Honor, for the record, we would object to any testimony about dogs found that had nothing to do with this case.

The State claims this objection was inadequate to preserve appellate review.    From the context of

the questioning and the objection lodged, it appears that, while Holz may have been objecting to

any reference to any dead dogs found in the vicinity of her property (and this is how she couches

her appellate point of error), at most she timely objected to the question about finding dead dogs on

the Corp property, and failed to timely object to Adams' answer that he found dead dogs on his

property.[5]    Therefore, we find Holz only preserved error regarding the question and answer about

---

[5]To preserve error regarding the improper admission of evidence, the appellant must make a timely and specific objection to the complained-of evidence at trial.    TEX. R. APP. P. 33.1(a); *Ramirez v. State*, 74 S.W.3d 152, 154 (Tex. App.—Amarillo 2002, pet. ref'd).    Failure to do so waives any error in the admission of the evidence. *Boyington v. State*, 787 S.W.2d 469, 470–71 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd).    To be timely, a party must object either (1) before the evidence is admitted, if possible, or (2) if not possible to object before the evidence is admitted, as soon as the objectionable nature of the evidence becomes apparent.    *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991).    An appellant's objection is untimely, and error is waived, if he or she fails to object until after an objectionable question has been asked and answered and he or she can show no legitimate reason to justify the delay. *Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995).

7

animals found on the Corp property. The matter becomes moot, though, because that objection does not comport with the appellate point Holz now raises.

We read Holz's objection as one to the relevance of the evidence. In contrast, in her appellate brief, Holz complains that admission of evidence that "dead dogs were found in the vicinity" of Holz's property was erroneously admitted. Holz argues that, "even if the evidence fits into an exception to the extraneous offense rule such as res gestae, identify [sic], scienter, motive or to refute a defensive theory so as to become admissible, its relevance must not be outweighed by the prejudicial effect." Holz's appellate point does not comport with her trial objection and is not preserved for our review. TEX. R. APP. P. 33.1; *Resendiz v. State*, 112 S.W.3d 541, 547 (Tex. Crim. App. 2003).[6]

*(3)     The Evidence Was Legally and Factually Sufficient*

Holz also complains the evidence is legally and factually insufficient to support the jury's verdict. We disagree.

---

[6]The balance of her argument is as follows:

> Appellant urges that the evidence of dead dogs was not admissible under any exception to the extraneous offense rule and that the prejudicial effect of admitted evidence of dead dogs in a prosecution for animal cruelty is so prejudicial that the case must be reversed and retried without this evidence.

We infer that in this single sentence Holz is attempting to argue violations of evidentiary Rules 403 and 404(b). TEX. R. EVID. 403, 404(b). Not only are discrete, specific objections required to raise these legal points, but individual, specific legal arguments must be presented to address each asserted rule violation on appeal. *See Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g); *see also* TEX. R. APP. P. 38.1(i).

In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the prosecution and determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009); *Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008).

In a factual sufficiency review, we review all the evidence, but do so in a neutral light instead of the light most favorable to the verdict. We determine whether the evidence supporting the verdict is either too weak to support the fact-finder's verdict, or, considering conflicting evidence, is so outweighed by the great weight and preponderance of the evidence that the jury's verdict is clearly wrong and manifestly unjust. *Laster*, 275 S.W.3d 512; *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007).

In this analysis, we use a hypothetically correct jury charge to evaluate both the legal and factual sufficiency of evidence. *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008). Such a charge accurately sets out the law, is authorized by the indictment (in this case, the information), does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d 321(Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). To convict Holz under this statute and the information filed by

9

the State, the State had to prove that Holz (1) intentionally or knowingly; (2) failed unreasonably to provide necessary food, water, care, or shelter; (3) to an animal in Holz's custody. TEX. PENAL CODE ANN. § 42.092(b)(3) (Vernon Supp. 2009).

Holz lived near Lake O' the Pines in Marion County. She had about thirty to forty or more dogs in and on the grounds of her house in Marion County in July 2008.[7] The dogs were found in wretched condition—many with matted fur, eye discharges which indicated infections, and living in unclean pens. Inside the house, where many dogs were housed, was wall-to-wall compacted excrement, which produced a dangerous level of ammonia within the residence.

Don Adams lived across the street, about 300 yards from Holz's residence. Adams was concerned about the large number of dogs on Holz's property. On one occasion, Adams found dead dogs on his property. Adams also found a large plastic container on the property adjacent to his, which at trial Adams and the State referred to as "Corp" property. Track or drag marks led from the container to Holz's property. Adams described seeing evidence of several puppies dead after laying in the road and other dogs dying off. He described an unpleasant smell from Holz's property when the wind blew toward Adams' property. Adams voiced these concerns to Marion

---

[7]The numbers of dogs, including on Holz's property outside the house and inside the house, varied. The State asked Holz how many of the eighty dogs found were hers. Holz said there were not eighty dogs present, but that she had twenty-four. SPCA investigator West testified there were thirty to thirty-five dogs inside the house, but never estimated the number of dogs outside Holz's home. Wedding, president of the Humane Society of Marion County, testified there were thirty to thirty-seven dogs inside the house. Several photographs admitted into evidence showed, perhaps, tens of dogs in the fenced areas immediately outside the home.

County law enforcement agencies, who put him in touch with Caroline Wedding, president of the Humane Society of Marion County.

Wedding made contact with Holz and ultimately visited Holz's property. As soon as Wedding emerged from her car at the Holz property, Wedding's leg was "covered" with fleas. She gave Holz flea shampoo, loaned her crates for carrying the dogs, and arranged for payment for a local veterinarian to administer vaccines to the several puppies Holz had. Wedding and Holz discussed that puppies were more adoptable if they had been given vaccinations. On her first visit, Wedding did not go in Holz's house, but said there was a stench or smell coming from the house.

On July 10, 2008, when Wedding came to the house with the SPCA and the animals were seized, Wedding described the inside of the house, where Misty was found. Wedding saw "feces up several feet on the walls" and she said "everything" in the house was covered in feces and urine. West described the feces as compacted like concrete. Wedding said she was "[a]bsolutely" sure there was insufficient food for the dogs on Holz's property. When Misty, the subject of the instant information, was released from the house, the dog stopped at a food bowl and ate "voracious[ly]:" there was "no stopping the dog from eating the food." The dog "just had no hair" said Wedding, which she said indicated malnutrition. Wedding said the dogs in the house did not have access to adequate water. While there was evidence of some water in bowls inside and

11

outside the house, Wedding testified that there was only enough for subsistence and that "feeding a dog marginally or at all [sic] and giving it water is not proper care of an animal."

Misty is portrayed in a picture placed into evidence. She was very thin, with ribs clearly distinguishable under her skin. She was almost completely bereft of hair.

West testified he was notified by Wedding about the dogs and the conditions at Holz's property. West first visited the property without Wedding, July 9, and spoke to Holz, who would not allow West to examine the interior of her home or the dogs there without a warrant. In his tour of the exterior of the property, though, West immediately had concerns about lack of water and shelter for the dogs he saw, as well as evidence of malnutrition. When West asked Holz about the veterinary care the dogs received, Holz told him she "believed in the holistic approach. . . . and only the really worst ones needed to be seen by a vet." Based on his observations, West decided the dogs needed to be removed from the property, and he secured a warrant for their seizure. On July 10, he oversaw the seizure, where SPCA personnel identified, catalogued, and secured something in excess of thirty dogs. When West tried to enter the house, he was met with an "extremely foul odor" coming from inside. Using an ammonia meter, he detected a dangerous level of ammonia. He had to use a respirator to get into the house, and in less than a minute the ammonia meter hit its maximum reading of ninety-nine parts per million. According to West, any reading higher than fifteen parts per million is unsafe for long-term exposure; a reading of more than fifty, said West, would usually preclude entry "without protection." West never specifically

12

said there was no circulation or air conditioning in the house, but did say the temperature outside was in the nineties. Holz would later testify the house had adequate ventilation and air conditioning.

The animals were put in individual crates or containers and taken to the SPCA facility in McKinney, Texas. During the seizure process, photographs were taken to detail the condition of the property; the photographs were admitted into evidence. West described a large amount of feces and refuse in the dogs' pens and said he did not see any water in the various water bowls in the outside area. Nor did he recall seeing any food in any of the food bowls.

Misty was described by West as "emaciated." West said, "On a one to five scale, one being a perfectly healthy dog, five being grossly emaciated, the dog is a five. It's emaciated."

The State presented a veterinarian, Dr. Carol Hedges. She had reviewed the "Rescue Evaluation Form" completed by an SPCA veterinary technician and a document completed by the SPCA's veterinarian.[8] Hedges said that irrespective of the report from the SPCA veterinarian, pictures she had seen of the dogs at Holz's property made Hedges take note of the animals' body condition, hair loss, dermatitis, and long nails. She said these conditions were objectively noticeable, as opposed to subjective descriptions she would have gleaned from other's reports. These conditions indicated the dogs were not getting "basic care." Based on the pictures she had seen of the various dogs, and Misty in particular, as well as the SPCA veterinarian's report, she

---

[8]These documents, State's Exhibits 4 and 5 respectively, were admitted into evidence during the testimony of West, and form the basis of Holz's first two points of error.

13

opined that Misty was not being fed adequately. Hedges pointed out that, where multiple dogs are present, a "pecking order" is established where, even if food is present, some animals may not get to eat. She expressed the specific opinion that Misty did not appear to be in good health. As for the house in which Misty was found, Hedges said the conditions in the house would "perpetuate repeated infections, parasites, and other diseases."

Holz took the stand in her defense. She testified that Misty was actually about fifteen years old when seized, as opposed to the age of about eight as estimated by the SPCA forms. Holz attributed Misty's skin problems to hormones, a thyroid condition, and demodex mange, which Misty had inherited from her mother. Holz said she fed Misty holistic, natural foods (including ground turkey) frequently, every two to three hours. She said Misty had been very sick, but, in the two to three months before the seizure, Holz had nursed her back to the condition in which the SPCA found her in July 2008. Holz acknowledged that Misty had not been seen by a veterinarian since 2002. Holz also pointed out several food and water bowls throughout the inside and outside areas where the dogs lived and said the house was well ventilated with central air, window-unit air conditioners, and fans, which kept the house "air conditioner cool." Holz acknowledged there was a problem with too many dogs, which "overwhelmed" her, but she blamed the problem on people routinely dumping puppies and dogs near her property and she said she had consistently tried to get help from Marion County authorities.

    *(a)    Legal Sufficiency*

The evidence included a picture of Misty, missing most of her hair and with ribs showing prominently through her skin; descriptions of Misty eating "voraciously" when food was placed in front of her; and the SPCA investigator describing Misty as "emaciated." The home in which Misty was kept had a dramatically unsafe ammonia level. There were upwards of thirty or more animals living inside the house, which was described as filled with excrement. The evaluation forms completed on the SPCA's taking possession of Misty described her as emaciated and noted various parasites as well as discharges from her eyes and nose and the apparent presence of mange. Looking at the verdict in the light most favorable to the prosecution, a rational jury could have found that Holz unreasonably knowingly failed to provide, at a minimum, adequate food, care, or shelter for the dog the subject of this suit. The evidence was legally sufficient.

*(b)*     *Factual Sufficiency*

Here, we also look at the evidence that opposed the judgment of the trial court. Holz told the jury she fed Misty every two to three hours and, at the time of the seizure, had been nursing Misty back to health for months. Holz said the floor of the house was covered in chocolate-colored carpet, not compacted feces. As regards the ammonia-concentrated air and stench described by State's witnesses, Holz said that she had ample ventilation in the house with air conditioners and fans and that she did not notice any smell, though she did admit it could have been because she was around it all the time. Contrary to the heart of the State's allegations that Holz did not provide sufficient water and food, the testimony from State's witnesses was that they

15

could not be sure no food or water was set out. In some of the pictures admitted into evidence, water and food are visible in bowls on the ground. However, West did testify that the SPCA personnel set out food when they arrived. We defer to the jury to resolve conflicts in testimony and evaluate witness credibility, and will not substitute our opinion unless the jury's finding is clearly wrong or unjust. *Jones v. State*, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996).

Considering all the evidence in a neutral light, we find that the evidence was neither so weak nor so outweighed by the great weight of any contrary evidence as to make the verdict seem clearly wrong and manifestly unjust. The evidence was factually sufficient.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     February 10, 2010
Date Decided:       March 23, 2010

Do Not Publish

16